No. 1785

Second Circuit Appeal

**BUILDERS' SUPPLY CO. v. INDEPENDENT ICE AND COLD STORAGE CO., ET AL.**

---

(Feb. 20 1925, Opinion and Decree.)
(April 11, 1925, Rehearing Refused.)

---

(*Syllabus by the Editor.*)

1. **Louisiana Digest—Obligations—Par. 149; Sales—Par. 121.**
Where the plaintiff at all times stood ready to comply with its contract and to furnish the full quantity of Winn-

field stone called for in the contract and defendant was not in a position to receive the same because the engineer or architect would not allow the same to be used, the defendant can not recover from plaintiff in a reconventional demand.

Appeal from First Judicial District Court of Louisiana, Parish of Caddo, Hon. E. P. Mills, Judge.

Action by the Builders Supply Co. against the Independent Ice & Cold Storage Co. for $795.06, balance of account for material furnished in building the Independent Ice & Cold Storage plant.

The defendant, Benoit Construction Company, answered admitting the correctness of plaintiff's demand and filed a claim in reconvention for $1,700.36.

There was judgment in favor of the plaintiff on its main demand for the amount sued for, $795.06, and for the defendant, plaintiff in reconvention, for the sum of $910.69.

Judgment amended and affirmed.

Blanchard, Goldstein & Walker, of Shreveport, attorneys for plaintiff, appellant.

Crain, Benoit & Jackson, of Shreveport, attorneys for defendant and plaintiff in reconvention.

REYNOLDS, J. In this cause, plaintiff sues for $795.06. Defendant, plaintiff in reconvention, Benoit Construction Company, claims judgment in reconvention for $1,700.-36 for breach of contract on the part of plaintiff.

The real question in dispute is the reconventional demand.

Defendant, plaintiff in reconvention, claims that the plaintiff, Builders Supply Company, contracted to furnish to the defendant, plaintiff in reconvention, 750 cubic yards of clean crushed stone for use in building the Independent Ice & Cold Storage plant, or a sufficient quantity of such stone to complete the building of the Independent Ice & Cold Storage Company that was being built by the defendant, the Benoit Construction Company.

Defendant, plaintiff in reconvention, claims that plaintiff breached its contract and that defendant, plaintiff in reconvention, was forced to buy other material in the open market to complete its contract with the Independent Ice & Cold Storage Company at a loss of $1,700.36.

Plaintiff alleges that it furnished a portion of the crushed stone contracted for by the defendant, plaintiff in reconvention, Benoit Construction Company, and tendered several additional cars of the Winnfield crushed stone at the point of delivery and that the same were rejected. Plaintiff also claims that it stood ready at all times to comply with its contract.

In passing upon the differences between the plaintiff and defendant, the first thing to be considered is the real contract between plaintiff and defendant. This contract consists of a letter or confirmation which reads as follows:

"Shreveport, La., October 28, 1919.
Benoit Const. Co.
   City.
Gentlemen:

We are pleased to confirm sale to you of 1400 barrels of cement at $3.30 per barrel including sacks that may be returned in good condition for credit to point of shipment at 15c each. 750 cu. yds. of 2400 lbs. of crushed stone at $3.15 per cu. yd. 250 barrels of bulk lime at $1.80 per barrel.

These prices are f. o. b. cars Independent Ice Co. plant. Also 1,000 cu. yds. river sand at $1.75 per cu. yd. delivered by teams and truck to job. We have placed your order for cement, rock and lime and are advising them that you will be ready within two weeks. Kindly give us shipping instructions as far in advance of your needs as possible so as to avoid the delay.

The above quotations are based on freight rates in effect at this time and these prices would be changed if the rate would be lowered or raised.

We certainly appreciate your placing your order with us and will do our best to render good service.

Very truly yours,<br>
Builders Supply Co. Inc.<br>
J. J. Hamiter."

JJH/HH

It will be seen from the above letter that the real contract was to furnish crushed *stone*. But Mr. J. J. Hamiter of the Builders Supply Company and Mr. A. Benoit of the Benoit Construction Company both testify that the stone referred to in the above contract was to be Winnfield crushed stone.

J. J. Hamiter, page 33:

"Q. What did you sell on that occasion, Mr. Hamiter?
"A. Winnfield rock.
"Q. Did you know anything about the terms of his contract?
"A. No, sir.
"Q. Did he know he was contracting for the purchase of Winnfield stone?
"A. Yes, sir, he understood it, I am sure, that it was Winnfield rock."

Mr. A. Benoit, page 19:

"Q. How long have you been dealing with Winnfield stone?
"A. About ten years.
"Q. You have dealt with it and know Winnfield stone for that length of time?
"A. Yes, sir, I think I used it in 1912, I think nine years it is, nine years.
"Q. When you bought this stone from the Builders Supply Company through Mr. Hamiter you knew you were getting Winnfield stone? did you not?
"A. Yes, sir, I understood that. That is the only quarry in this neighborhood, in this section of the country.
"Q. You contracted for Winnfield stone?
"A. Yes, sir, I understood it was. Of course, I don't know but what he might have found a new quarry but there is no doubt but what we knew it was coming from there, that is the only quarry in this section of the country to get from."

Page 19:

"Q. As a matter of fact Mr. Hamiter just contracted to sell you so much of a certain size Winnfield stone of an amount sufficient to go into that building out there?
"A. He did.
"Q. From this evidence and the letter from the Builders Supply Company to Benoit Construction Company the conclusion is irresistible that the stone contracted to be furnished was to be Winnfield crushed stone.
" 'Did ye never read in the scriptures. The stone which the builders rejected. The same was made the head of the corner?' "

Let us, then, inquire as to the stone tendered by the plaintiff, Builders Supply Company, and rejected by defendant, plaintiff in reconvention, Benoit Construction Company.

As to the quality of this stone, it is to be remembered that is was sold to Benoit Construction Company by the Builders Supply Company at $3.15 per cubic yard f. o. b. Shreveport, and sold in the open market at $4.60 per cubic yard for account of the Benoit Construction Company.

As to the fitness of this stone, it is testified by Mr. Rube McKellar, page 27.

"Q. Did you purchase some Winnfield stone that had been delivered at the Independent Ice & Cold Storage plant for the Benoit Construction Company during 1919, the latter part of 1919?
"A. Yes, sir.

"Q. That was the stone that had been rejected there by the engineer in charge of that work?
"A. I think so, yes, sir, said it had been rejected.

"Q. Was that stone in good condition?
"A. If it was not I would not have used it, I thought it was.

"Q. Was it as good as the ordinary run of that Winnfield stone?
"A. Yes, sir, except a little colored.

"Q. What do you think that color was caused by?
"A. Well, they took it off the cars—taking it off the cars, cars were very scarce and I suppose the Winnfield people were scarce of cars and threw the stuff on the ground and it got stained, it was colored that way.

"Q. Was there any appreciable amount of clay or dirt in that rock?

"A. Not that I noticed, and I have used a good deal of Winnfield rock and other kind too."

Page 28.

"Q. Was it as good as the ordinary run of that rock?

"A. I used it for the same purpose and was glad to get it.

"Q. When you went to get that rock did Mr. Benoit want to use some of it on some other job?

"A. I hauled the rock away and Mr. Benoit sent down to get it and he said he wanted some rock himself and I told him I had bought this rock myself.

"Q. Mr. Morris was Mr. Benoit's foreman?

"A. Morris was there and I told him I wanted all of it myself, that I needed it, he sent Mr. Deas there and I sent him away."

Mr. R. O. Marks, contractor, page 30:

"Q. Did you see the stone down there?

"A. Yes, sir.

"Q. What was the condition of the stone? Mr. Marks?

"A. It was in good condition to use, we use the same stone right here in town.

"Q. Just like other Winnfield stone?

"A. Just like other stone we would get in, Yes, sir, just about the same."

Mr. Joe McGurk, page 32:

"Q. I believe you hauled that stone for Mr. McKellar?

"A. I hauled it for Mr. McKellar, part of it.

"Q. In what condition was that stone in, Mr. McGurk?

"A. About like all other Winnfield rock that I have been hauling for the last eleven years, there is a kind of dust in this Winnfield rock and when it is real dry weather it is awful white, but in wet weather it stains the rock and looks muddy. In dry weather if you get a car in that has not been rained on it is just as white, but as soon as it rains on it, it gets stained, I think it is caused by crushing it, bound to be some there.

"Q. This rock was in as good condition as any rock you hauled?

"A. Yes, sir, like all other rock.

"Q. You think the appearance of it was caused by stain?

"A. Yes, sir.

"Q. Would that affect the rock any?

"A. Never heard any complaint from any other contractors about it.

"Q. It did not affect the rock?

"A. No, sir, I shouldn't think it would."

John Morris, page 10:

"Q. Were you employed by the Benoit Construction Company in 1919 and 1920?

"A. Yes, sir.

"Q. Were you employed down there on the Independent Ice & Cold Storage Company job?

"A. Yes, sir.

"Q. Well, do you know whether or not some of the rock was rejected?

"A. Yes, sir.

"Q. What was the condition of the rock at that time?

"A. There was quite a little clay in it, the rock was a little dirty. When it was lying on top of the car, it was raining a good deal at that time, and that that was on top of the car had the appearance of being dirty and clear as you ever saw and after it was unloaded and rained on it again it would have the same appearance again."

Page 11:

"Q. In this particular lot that was rejected, was any of that used at all?

"A. No, sir, I don't believe any of it was.

"Q. Had there been any of the Winnfield stone use prior to this shipment?

"A. Yes, sir.

"Q. Was that the same kind of stone, the same quality as this?

"A. All looks along the same line, very good average, possibly the last or rejected portion may have been a little worse than the other."

Ed. Nield, architect, a witness on behalf of defendant, testified, page 25:

"Q. If there is any appreciable amount of sand, clay or dirt in the aggregate does it make an objectionable concrete?

"A. Some amount—some amount is not objectionable but a large amount is."

Page 26:

"Q. Are you familiar with Winnfield stone?

"A. Yes, sir

"Q. Are you familiar with the average run of that stone as used in Shreveport?
"A. I think so.
"Q. Would you say that ordinarily it didn't have any foreign substance in it?
"A. That that I have used has not been objectionable."

J. J. Hamiter, page 33.

"Q. Did you know anything about the terms of his contract?
"A. No, sir."

Page 34:

"Q. Did you agree to furnish him rock that would be satisfactory to the architect in charge out there?
"A. I did not.
"Q. Would you have done such a thing?
"A. No, sir."

Upon this evidence we conclude that the stone rejected by the defendant, Benoit Construction Company, was just such stone as the plaintiff was authorized to deliver under its contract.

The only other question remaining is, did the plaintiff discharge its obligation under the contract? Was the plaintiff in position and willing to furnish stone in accordance with his agreement?

As to this, we quote the evidence of Mr. A. Benoit, page 12:

"Q. Did the Builders Supply Company furnish you rock under that agreement?
"A. They furnished me four or five cars of mighty nice rock, I recall that we put in footings with the first rock supplied which was real nice clean rock, such as we had been accustomed to getting from that source and then all at once it seemed they struck a new vein in the quarry there of an entirely different color to that which we had been accustomed to receive from Winnfied."

Page 14:

"Did you instruct the Builders Supply Company as to what disposition, if any, to make of the rock that was rejected?

"A. My recollection is that the rock had been rejected and I wanted him to take it away from there and he interested himself in the matter, perhaps to help me, and got Mr. Rube McKellar and told me he sold it to Mr. McKellar and Mr. McKellar took it off and used it for sidewalks and curbs, at least he told me he was going to use it for sidewalks and curbs, it was all hauled away from the building."

J. J. Hamiter, page 34:

"Q. Mr. Hamiter, you were ready to continue to furnish Mr. Benoit with Winnfield rock?
"A. Yes, sir, he stopped it from the job.
"Q. Stopped you from furnishing that rock?
"A. Yes, sir."

From this evidence it is clear that the plaintiff was ready and willing and in position to furnish the defendant, plaintiff in reconvention, all of the stone he contracted to furnish from the Winnfield quarry and that the defendant was not in position to receive the same because the engineer or architect would not allow same to be used.

As to the engineer, Mr. A. Benoit testified, page 21:

"Q. Was not this engineer on that job pretty finicky, was he not rather strict?
"A. You may call it what you please, I call it ignorance."

Page 22:

"Q. As a mater of fact, was not your entire damage because of the action of the engineer in turning down this rock?
"A. Well, sir, the engineer was an onery cuss on general principles."

From all this testimony we conclude that the plaintiff at all times stood ready to comply with its contract and to furnish the full quantity of Winnfield stone called for in the contract between the plaintiff and the defendant the Benoit Construction Company.

For these reasons the reconventional demand of the defendant must be rejected.

It is ordered, adjudged and decreed that the judgment appealed from be reversed. and it is now ordered, adjudged and decreed that the plaintiff, Builders Supply Company, do have and recover judgment against defendant, Benoit Construction Company, for the full sum of $795.06 with interest thereon at the rate of five per cent per annum from judicial demand until paid.

It is further ordered, adjudged and decreed that the demand of the defendant in reconvention be rejected at its cost.

Plaintiff sued for judgment against the bondsmen of the defendant and against the Independent Ice & Cold Storage Company and introduced evidence entitling it to such judgment, but we fail to find in the transcript any answer on the part of either of these defendants or any minutes of the District Court showing that default had been entered against them. We are not therefore, at this time in position to render judgment against these two defendants. Plaintiff's rights, whatever they may be, as to these two defendants, are fully reserved.

It is further ordered, adjudged and decreed that defendant pay all costs of both courts.